SUNNITA BLOUNT, GA State Bar No. 411941
*PENTACLES GROUP*
957 Main St
Ste. A #264
Stone Mountain, GA 94104

Telephone:    800-820-8210
Emails:       sunnitab@pentacleslegalgroup.com,
              sunnita.blount@gmail.com

*Additional Counsel Listed on Next Page*
*Attorneys for Plaintiffs*



## 1.    UNITED STATES DISTRICT COURT

## DISTRICT OF GEORGIA

|  |  |
|---|---|
| STEPHEN WILKES | **DOCKET NO** 1 :22 -CV- 2009 |
|  | **CIVIL ACTION** |
| Plaintiffs, | **COMPLAINT FOR VIOLATIONS OF:** |
| v. | (1) TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 |
| VENTURES MCDONALDS XXIV, LLC | (2) FALSE CLAIMS ACT |
| & | |
| MESSER VENTURES, LLC | [JURY TRIAL DEMANDED] |
| Defendants. | |

DONNIECE GOODEN, DC Bar No. 986180 , Maryland Bar No.  0710030001
HIEROPHANT LAW
*Pro Hac Vice Motion Forthcoming*
1717 Penn Ave NW
STE # 1025
Washington, DC 20006

*PENTACLES GROUP*
957 Main St
Ste. A #261
Stone Mountain, GA 94104

Telephone:    800-820-8210


Emails:        dgooden@pentacleslegalgroup.com
               donniecesg@outlook.com

Plaintiff, Stephen Wilkes, 172 East Main Street, Duluth, Georgia, alleges the following:

## I.    NATURE OF THE ACTION

1.    This is an action for relief from employment discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII"), and the False Claims Act.

2.    Plaintiff, Stephen Wilkes, (also referred to as "Plaintiff" or "Mr. Wilkes) alleges that Defendant, Venture McDonalds and Messer Ventures, through its agents, engaged in racial discrimination, retaliation, hostile work environment, and constructive termination. This transpired due to Mr. Wilkes reporting Paycheck Protection Plan (herein after referred to as "PPP") loan fraud, discrimination, sexual harassment of minors, drug use on work premises, and the storage of drugs on work premises.

## II.    THE PARTIES

3.    Plaintiff worked as an Assistant Manager at McDonalds, located at 750 Pike Street, Lawrenceville, GA 30045 and another McDonalds located at 3393 Sugarloaf Pkwy, Lawrenceville, GA 30045 from March 2020 to March 2021.

4.    The McDonalds where the Plaintiff worked was part of Ventures McDonalds and Messer Ventures.

5.    Ventures McDonalds" or "Ventures" (hereinafter referred to as "Defendant Ventures") is owned by Paul Messer.

6.    Messer Ventures (hereinafter referred to as "Defendant Messer Ventures") is owned by Lynn Messer, Paul Messer's sister.

7.    The McDonalds located at 750 Pike Street Lawrenceville, GA is part of Ventures McDonalds.

8.     The McDonalds located at 3393 Sugarloaf Pkwy, Lawrenceville, GA 30045 is part of Messer Ventures.

9.     Defendant Ventures McDonalds and Messer Ventures will collectively be referred to as "Defendants".

10.    At all times relevant herein, Defendants had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII.

11.    Defendants often collaborated with one another and transferred staff between Ventures McDonalds and Messer Ventures.

12.    Defendants are liable for the acts of their agents and employees as set forth below.

### III.   JURISDICTION AND VENUE

13.    This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

14.    Venue is proper in, and Defendants are subject to the personal jurisdiction of, this Court because Defendants maintain facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

### IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

15.    Plaintiffs timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On 02/23/2022, the EEOC issued the Plaintiff a Notice of Right to Sue letter.

## V.    FACTUAL ALLEGATIONS

16.     Shortly after the Plaintiff began working for the Defendant he immediately began to notice issues with management and other disturbing events. In March of 2020, while working at the Pike Street McDonalds location, the Plaintiff privately approached the Regional Manager and gave him a  detailed narrative of all the wrong doings and illegal activity that he witnessed.

17.     The Plaintiff witnessed this activity as the Assistant Manager of this McDonalds location. The behavior and activity witnessed by the Plaintiff severely affected him and the staff. Actions, such as blatant and repeated racism, abuse of authority, intimidation, harassment, retaliation, money theft, sexual harassment against employees that were minors, illegal use of controlled substances by employees, and government fraud by upper management.

18.     When the Plaintiff confronted upper management about what he was witnessing, he assumed upper management and the owner did not know about these issues. Plaintiff later learned that upper management and the owner were not only aware of the wrongdoing, but also were  participants of it. After speaking to the Regional Manager about these issues, Mr. Wilkes was assured that he would look into the matter and that he would protect Mr. Wilkes by keeping it private from the store level employees.

19.     Plaintiff also shared his concerns with Mr. Messer . Mr. Messer immediately became defensive and stated that he had nothing to do with the government fraud. He asked Mr. Wilkes to present him with evidence of the government fraud. Mr. Messer's main concern appeared to be only the government fraud, not the multitude of other issues shared by Mr. Wilkes.

20.     The Plaintiff explained that he had the names and screen shots proving that fake employees were hired and put into the system.

21.     These fake employees were "hired" by McDonalds, but these "employees" did not work at McDonalds, yet they were receiving a paycheck. Plaintiff explained that he was a direct witness due to his dual role as Assistant/ Hiring Manager. Plaintiff informed Mr. Messer that the Store Manager, Mario Salgado, and the District Manager, Herles Ortiz, asked Mr. Wilkes to hire a list of people handwritten on a scrap of paper.   Mario Salgado and Herles Ortiz forced two (2) other managers to process the paperwork.

22.     These managers expressed concerns to Plaintiff that something strange was taking place, but were not aware that they were being tricked into furthering fraud.

23.     When the Plaintiff refused to be part of this illegality and refused to hire fake employees, he was offered a bribe. Plaintiff was advised that the money was from the COVID relief fund and that if Mr. Wilkes helped them, he could make extra money. They told Mr. Wilkes that they would allow him to hire "fake employees" exactly like they are doing, using his friend's social security numbers to receive extra paychecks for himself.

24.     Plaintiff sternly refused their offer and warned them that this is illegal and dangerous, as well as, a federal crime. Plaintiff warned Mario Salgado and Herles Ortiz that if they proceeded with their actions, it would eventually come to light and when it does, the punishment could be very high.  Despite this warning, Mario Salgado and Herles Ortiz moved forward with their actions, processed the paper work themselves, and hired fake employees. After Mr. Wilkes refused the bribe, Mr. Salgado told him to stop hiring people for a while.

25.     Plaintiff was the Assistant Store Manager and held the responsibilities of Hiring Manager as well. Mario Salgado told Mr. Wilkes that he could still interview anyone who fills out an application, "so that McDonalds won't get in trouble", but to not hire anyone.

26.     Mario Salgado stated that he was told by Herles Ortiz, the District Manager, and

Allen Schuman, the Regional Manager, to immediately stop all hiring for the moment. This decision came from 'high up and this  was during the very early stages of the COVID pandemic. Additionally, people that lost their jobs due to business closures were now applying at McDonalds in record numbers. Mr. Wilkes was later told by Mario Salgado that this decision was made because McDonalds was trying to qualify to receive the PPP Loan from the government.

27.     After Mr. Wilkes notified Mr. Messer of the above referenced fraud, he reminded Mr. Messer that there were other illegal schemes taking place at his McDonalds. Mr. Wilkes informed Mr. Messer of employees using and storing drugs on McDonalds' premises, sexual harassment of minor employees, and retaliation. In response to the information provided by the Plaintiff, Mr. Messer stated that he and his Regional Manager, Allen Schuman, would look into the other issues.

28.     Mr. Messer stated that he did not accept racial discrimination and the person responsible for it would be terminated immediately. That action, and or termination, never happened.

29.     The racial issues within that Pike Street location were pervasive throughout the management and staff . For example, an employee used the N-Word multiple times to insult a fellow staff member who is African American. This person was not terminated or even reprimanded.

30.     This person openly admitted to store management to using the 'N-word' as an insult to the other staff members. There were also multiple witnesses to this behavior. When it occurred, Mr. Wilkes immediately went to Mario Salgado, the Store Manager, requesting that the behavior stop. Mr. Wilkes explained to Mario Salgado that management could not allow or

condone that type of behavior.

31.     Plaintiff notified Mario Salgado that by not taking corrective action he was in essence saying that McDonalds condones racially motivated and offensive actions against its employees. Mario Salgado flatly refused to terminate or even reprimand this person.

32.     A week after reporting the racist and abusive language, Mr. Wilkes found out that the person that used the N-word was secretly promoted to management and received a pay raise. Again, Plaintiff went to Mario Salgado and voiced his concerns and objections, to which Mario Salgado replied, "I'm not firing her. I promoted her because I want to. I spoke to Herles Ortiz, who agrees to not fire her." Mario Salgado stated that Herles Ortiz spoke with McDonalds lawyers about this issue and that they all agree she should not be fired.

33.     Being promoted only bolstered this person to be more confident and bolder in their wrong doings. This person has also insulted two other employees by calling them the "N-Word", which resulted in one of the offended employees quitting.

34.     Herles Ortiz stated that if he were to fire her, then they would fire the African American person too. Mario Salgado stated that he could not understand why black people get mad at the word because it is only a word and he does not care if it is used.[1]   It does not matter if Mario Salgado did not care if this word was used. This was not his decision to make. The very use of this word against an African American creates a hostile work environment, not only to the recipient of the verbal abuse, but also to witnesses that find the word abhorrent.

---

[1]  Supreme Court Decision No. 05–379.Decided February 21, 2006. https://www.law.cornell.edu/supremecourt/text/05-379

35.     Pursuant to a Supreme Court decision rendered in *Anthony Ash ET. Al vs. Tyson Foods, Inc.*, it was ruled that the speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage.

36.     Mario Salgado was wrong to tell someone of African descent that they should not care about the use of a word that many people of color heard before being lynched, before they died, while being attacked, and while enduring other horrific injustices. The N-word carries weight. It is a word that invokes severe pain to many people of African descent. It is a word that was used to terrorize, belittle, and dehumanize black people.

37.     Plaintiff felt the need to record the conversation regarding use of the n-word because he was retaliated against after notifying upper management and the owner of other egregious and illegal activity occurring at McDonalds.

38.     After the Plaintiff expressed his concerns, Mr. Messer requested that Mr. Wilkes write a proposal for corrective action. Mr. Messer asked that Mr. Wilkes submit the proposal only as a hard copy of the Report.

39.     Mr. Wilkes provided a hard copy of the Report and some of the evidence he held to Mr. Messer and Mr. Allen.

40.     After providing a hardcopy, Mr. Messer asked the Plaintiff to attend a private meeting at their corporate office location to discuss the Report that he provided.

41.     Plaintiff was told that only the owner, the Regional Manager, and himself would be in the meeting.

42.     On the day of the meeting, Mr. Wilkes discovered that the Regional Manager and Mr. Wilkes would be the only attendees of the meeting.

43.     Plaintiff felt apprehensive about the change of plans; therefore, he recorded the

conversation for his safety. During the meeting, Mr. Allen admitted that he has found many other "fake employees" at their other store locations.

44.     Plaintiff was asked to move to another McDonalds location.

45.     This new location was owned by Mr. Messer's sister, Lynn Messer and is part of Messer Ventures, LLC.

46.     Mr. Messer assured Mr. Wilkes that he would be OK and that Mr. Messer would take action.

47.     In response to the offer to relocate, Mr. Wilkes had another Manager at Ventures McDonalds speak to Mr. Messer. This manager worked for McDonalds for many years and witnessed this behavior during this time.  This manager witnessed the illegal activity multiple times and confirmed Mr. Wilkes' allegations to Mr. Messer.

48.     Plaintiff was present when this manager confirmed his allegations to Mr. Messer.

49.     The only resolution offered to Mr. Wilkes was a transfer to Defendant Messer Ventures. The retaliation escalated at the new location.

50.     The  first day of work at the new location, the Plaintiff was told he could not, in any form, discuss any of the issues he witnessed at the other location. Plaintiff was told doing so would result in his termination.

51.     A few weeks later, Mr. Wilkes quickly realized that something strange was happening. Plaintiff often worked the second shift (2pm to 11 pm) which is his normal schedule from the previous store location, but now, after 8:00 PM, he was left with only two employees in the store.

52.     During the busy hours from 8:00 PM to store closing, Mr. Wilkes would be left to operate the entire store with no substantial assistance.

53.     Plaintiff noticed that when any other managers worked the same shift, when Mr. Wilkes wasn't working that shift, there would be a full staff scheduled. On these types of nights, Mr. Wilkes would not be able to leave work on time. He would have to stay approximately 2 hours after the store closed since only himself and one other employee were in the building. He often got home after 3:00 am.  Instead of providing Mr. Wilkes with staff on that schedule, as he repeatedly requested, he only received repeated complaints from management regarding why it was taking him so long to leave.

54.     On another evening, with only two employees scheduled to work the shift, there was a full store of customers. Mr. Wilkes streamlined the orders so that he could service the customers more efficiently. This is a practice that he was trained to do at the Pike Street location. His plan worked and the customers received their food in a timely manner.

55.     The next day, Mr. Wilkes received a 'write up' reprimand to which he was informed he must sign. The 'write up' was for closing the lobby and one of the lanes early. Receiving this kind of reprimand did not align with the normal practices of the store. In fact, the approach Mr. Wilkes followed when the McDonalds was crowded and understaffed was the same strategy used by both McDonalds in the past.

56.     Eventually the Plaintiff realized that being offered to work at another McDonalds location was not Mr. Messers way of helping him continue employment, instead it was a ruse, a constructive way to terminate Mr. Wilkes.

57.     One afternoon the Store Manager of this new location[2], Anopa, told Mr. Wilkes that something very strange happened in her paycheck. Anopa asked if Mr. Wilkes would take a look at it to see if he understood the issue.

58.     On Anopa's paycheck, in the section that reflects the state and federal taxes, was a listing that reflected that McDonalds paid Anopa Ten Thousand dollars ($10,000) in COVID-19 Relief Funds. Anopa stated that she had never contracted COVID-19 and McDonalds never gave her Ten Thousand Dollars ($10,000) or any money that wasn't her normal salary. Based on her concern, Anopa then reached out to various other McDonalds managers. Some McDonalds managers also had this reflected in that section of their paycheck that pertained to state and federal taxes. None of them received any of the COVID-19 relief money that was reflected on their pay stubs. It was at this point that Mr. Wilkes was certain that the owners were part of the fraud and wrong doings.

59.     The Plaintiff realized that Messer Ventures was also participating in the PPP loan fraud scheme.

60.     Plaintiff also realized that by giving his report to upper management and the owner, he unwittingly uncovered the owners and upper management involvement and as such was now a target of their ire.  Further, he realized that it was intentional that his shift had no employees scheduled to help operate the store, and that the complaints were intentionally set.

61.     Plaintiff was intentionally put in unreasonable circumstances as a retaliatory way to attach reprimands to his work record, which prior to this was exemplary, presumably to manufacture the appearance that Mr. Wilkes was a bad employee and terminate him. This would

---

[2]  The McDonalds located at Sugarloaf Pkwy, owned by Messer Ventures.

tarnish his work history so that if Mr. Wilkes ever decided to bring the managements wrong doings to light, he would only seem like a bad employee who is disgruntled and not credible. From the stress, pressure, and danger of this entire situation, Mr. Wilkes quit his job and took a substantial pay cut just to make sure and he and his family were out of danger.

62.     Due to the severe retaliation, Mr. Wilkes felt he had to quit. The treatment he received at both McDonalds locations became intolerable and Mr. Wilkes was forced to find another job.

63.     Plaintiff informed Mr. Messer that he was ready to immediately quit because the retaliatory behavior became unbearable.

64.     Months after leaving his job at McDonalds the retaliation continued. On or about September 2021, Mr. Wilkes received a message on Facebook messenger from a man he had never met.

65.     This individual sent the Plaintiff a picture of Brenda Cambron. Ms. Cambron was included in the Report Mr. Wilkes gave Mr. Messer. Plaintiff immediately became scared for his safety and the safety of his daughter. Plaintiff had further conversations with this person via Facebook Messenger.[3]

66.     The person that contacted Mr. Wilkes knew Brenda Cambron. The individual (the caller) is a Gang Member, who is in prison right now.

67.     Brenda Cambron visited this gang member and complained about Mr. Wilkes and the Report. She wanted the Plaintiff harmed. After being informed of this, Mr. Wilkes has been on high alert. He has become paranoid at any knock at the door and strange cars lingering on his

---

3       Mr. Wilkes chose Messenger in order to protect his personal phone number.

street, especially while taking his daughter to and from school.

68.     The Defendants actions were done in reckless disregard to the law or the
ramifications their actions would have on the Plaintiff or others. In addition, the Defendants
acted in reckless disregard to the legal rights of others.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Retaliation in Violation of
Title VII of the Civil Rights Act of 1964, *as amended*,
42 U.S.C. § 2000e-3(a)

69.     Plaintiffs incorporate by reference as if fully set forth herein the allegations
contained in paragraphs 1 through 68 above.

70.      Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits
employers from discriminating against an employee "because [she] has opposed any practice
made an unlawful employment practice by this sub-chapter." 42 U.S.C. § 2000e-3(a).

71.     Defendants did not exercise reasonable care to prevent harassment in the
workplace on the basis of national origin, and did not exercise reasonable care to promptly
correct any harassing behavior that did occur.

72.     As a direct, legal, and proximate result of the hostile work environment, Plaintiff
sustained economic and emotional injuries, resulting in damages in an amount to be proven at
trial.

73.     Defendants' unlawful actions were intentional, willful, malicious, and/or done
with reckless disregard to federal laws.

74.     Plaintiffs made informal and formal complaints to Defendants' agents and

employees opposing Defendants' unlawful, discriminatory employment practices based on national origin and sex.

75.     As a result of Plaintiffs' complaints, Defendants' agents and employees took materially adverse actions against Plaintiffs, including, but not limited to, issuing disciplinary warnings, threats of termination, and reprimands by supervisors. Plaintiff was subjected to retaliation by Defendants' agents and employees, including Ventures McDonalds' owner, the Store Manager, Mario Salgado; and District Manager Herles Ortiz.

76.     Defendants' agents and employees' conduct was not welcomed by the Plaintiff.

77.     The conduct was so severe or pervasive that reasonable persons in Plaintiffs' position would find their work environment to be hostile or abusive.

78.     Plaintiff believed their work environment to be hostile or abusive as a result of Defendants' agents' and employees' conduct.

79.     Defendants management level employees knew, or should have known, of the abusive conduct.

80.     Plaintiff provided management level personnel, including Paul Messer, with information sufficient to raise a probability of retaliatory conduct taking place at Venture McDonalds and Messer Ventures. This resulted in a hostile work environment.

81.     Moreover, the retaliatory behavior was so pervasive and open that a reasonable employer would have had to been aware of it. Indeed, management level employees were themselves complicit in the abusive conduct.

82.     Defendants' adverse actions constituted retaliatory workplace harassment.

83.     Defendants' retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

84.     Defendants' unlawful actions were intentional, willful, malicious, and/or done
with reckless disregard to federal laws.

85.     As a direct, legal, and proximate result of Defendants' retaliation, Plaintiffs have
sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in
an amount to be proven at trial.

86.     Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.

### SECOND CLAIM FOR RELIEF

Violation of the   Pay Check Loan Forgiveness Program
The False Claims Act
(31 U.S. Code § 3729)

87.     Plaintiffs incorporate by reference as if fully set forth herein the allegations
contained in paragraphs 1 through 86 above.

88.     A company can be liable under the False Claims Act (hereinafter referred to as the
"FCA") if it knowingly presents a false or fraudulent claim for payment or approval to the
government or uses a falsified record in the course of making a false claim.

The FCA can be enforced by individuals through *qui tam* lawsuits. This means a private
individual, known as a relator, can file a lawsuit on behalf of the government.

89.     Plaintiff directly informed the owner of Venture McDonalds and upper
management of Venture McDonalds and Messer Ventures of fraud involving  PPP loans,
including the creation of fake employees.

90.     When the Plaintiff discovered that Messer Ventures was also participating in PPP
loan fraud.

91.     Wilkes refused to be part of this illegality and refused to hire fake employees; he was then offered a bribe that he rejected.

92.     Based on this fraudulent activity, the Defendants received millions of dollars from a federal government program meant to help struggling businesses.

93.     Plaintiff is entitled to reasonable attorneys' fees and costs of suit, as well as, any compensation determined to be appropriate under the FCA.

## DECLARATORY RELIEF ALLEGATIONS

94.     As a direct, legal and proximate result of the discrimination, Plaintiffs have sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, the Plaintiff suffered emotional distress, resulting in damages in an amount to be proven at trial.

95.     Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

96.     A present and actual controversy exists between Plaintiffs and Defendants concerning their rights and respective duties.

97.     Plaintiffs contend that Defendants violated their rights under Title VII, as well as, participated in PPP loan fraud.

98.     Plaintiffs seek a judicial declaration of the rights and duties of the respective parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. For a declaration that Defendants' actions, policies, and practices as alleged herein were unlawful;

2. For lost wages and all other compensation denied or lost to Plaintiffs by reason of Defendants' unlawful actions, in an amount to be proven at trial;

3. For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

4. For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

5. For punitive damages in an amount to be determined at trial;

6. For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

7. For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k), and other laws; and

8.  For such other and further relief as this Court deems just and proper.


Dated:  May 19, 2022                    Respectfully submitted,
                                        Sunnita Blount
                                        PENTACLES GROUP

                                        Donniece Gooden
                                        PENTACLES GROUP

                                By:  *Sunnita Blount*
                                        _____
                                        SUNNITA BLOUNT

                                        Attorneys for Plaintiffs


## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all causes of action and claims to which they have a right to a jury trial.

Dated:  May 19, 2022                    Respectfully submitted,

                                        Sunnita Blount
                                        Donniece Gooden
                                        PENTACLES GROUP

                                By:  *Sunnita Blount*
                                        _____
                                        SUNNITA BLOUNT